**AFFIRMED and Opinion Filed October 5, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-19-00503-CR

**MITCHELL CONRAD JONES, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 366th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 366-81320-2018**

## MEMORANDUM OPINION

Before Chief Justice Burns and Justices Molberg and Carlyle
Opinion by Chief Justice Burns

A jury convicted Mitchell Conrad Jones of capital murder and the trial court sentenced him to life imprisonment. In two issues appellant argues the evidence is insufficient to support his conviction and the trial court erred in overruling his motion to suppress oral statements by appellant to investigating officers. We affirm the trial court's judgment.

In July 2009, Richard Robinson stayed briefly with his daughter Angela in Lewisville while having "an issue with a girlfriend." One afternoon, on July 19, 2009, Robinson left his daughter's apartment and said he would be back. He never

returned. After hearing nothing from Robinson for a couple of days, Angela and her brother attempted to file a missing persons report with the Lewisville Police Department, but the police declined the filing because Robinson was "able bodied" and not elderly. Finally, a week after his disappearance, police entered Robinson's name into a missing persons database, including a description of Robinson's car. A couple of days later, two Texas Rangers came to Angela's apartment and told her Robinson's body was found in the trunk of his car. Appellant was not arrested for almost nine years after Robinson's death.

Melissa police sergeant Michael Groettum was on patrol with Officer Michael Hagood on July 27, 2009, when he was called to a vacant building in Melissa, Texas, to investigate a vehicle associated with a missing person report. The vehicle was parked along the grassy median area, and there was "a very distinct decay odor coming from the vehicle." There was "a liquid that was leaking slowly out of the trunk that looked suspicious in nature." Groettum opened the trunk and discovered an "[a]lmost fully decayed body that was mostly liquefied."

A couple of weeks after Robinson's body was found, Angela and her mother met with Sergeant Babcock at the Melissa Police Department. The police did not have much information, their investigative leads had dried up, and Babcock said "we may never know what happened" to Robinson. Over the next eight years, Angela "never received one phone call from the police department."

In 2017, the Robinson family inquired with the Melissa Police Department and the Collin County District Attorney's Office about the status of their father's case. Texas Ranger Reuben Mankin became involved in the cold case and pulled the file on Robinson's case with persons of interest being appellant, Stacy Maloney, and Jasmine Salaz. In looking at the file from the previous investigation, Mankin saw there was "a lot done from the identity or the identification of the three individuals" and "cell phone records that had been obtained on each individual," but the case had "pretty much come to a halt." Mankin agreed with the prior investigator's assessment that appellant, Maloney, and Salaz "were somehow involved with the death of Richard Robinson," and Mankin's opinion was "based mostly on the phone records" he reviewed and Maloney's statement. In the investigation in 2009, Maloney was interviewed twice and Salaz was interviewed, but she "was detached and was not being fully open about what happened." Mankin found out that appellant had not been interviewed.

By comparing the phone records with Maloney's statement, Mankin saw that "based on the mapping . . . it was not consistent." The mapping had been done after the prior investigation in 2009. Mankin found that the prior investigator had gone to Maloney's house to interview her, and appellant answered the door. The investigator asked appellant if he had ever met Robinson, and appellant said he had not. Mankin "determined that we need to get a formal statement from [appellant]." Mankin located appellant, who was living in Kenner, Louisiana. After making

contact with Louisiana state police and telling them of his plan, Mankin went with Ranger James Holland to Louisiana to interview appellant. Mankin did not intend to arrest appellant, he did not have probable cause to arrest appellant, and he only expected to get "more pieces to the puzzle" from appellant. However, Mankin knew that text messages had been sent between Maloney and appellant, and "it was imperative to interview [appellant] and see what his side of it was."

Once he arrived in Louisiana, Mankin met with Louisiana state police and developed a plan for making contact with appellant. On the first day, March 6, 2018, Mankin established surveillance outside appellant's residence but did not see appellant. The next day, a state police agent was able to locate appellant at a laundromat in Kenner.

Mankin went to the laundromat, where he made contact with appellant and said he wanted to talk to him. Appellant "knew he was free to leave at that time," and he "got in his vehicle and followed [Mankin] to the station." Mankin did not tell appellant he was under arrest and did not tell him what Mankin was there to talk to him about. Mankin "did tell him that I was from Texas." Mankin was "seeking [appellant's] cooperation" and "didn't want to restrict his movements or anything like that." Appellant followed Mankin to the police station where "he was brought in to the station and he was sat down inside of a room." The police station did not have a "formal interview room that's set up with audio/visual capability," so Mankin activated audio recorders to capture the interview. Throughout the course of the

–4–

interview, Mankin told appellant "he could leave anytime he wanted to" multiple times. Appellant never indicated that he wanted to leave.

Ranger Holland, whose specialty is "interview and interrogation," reviewed all the information in the case and led the interview of appellant. At the beginning of the interview, Holland told appellant "he could leave, or we would drive him home." Holland had been waiting at the police station and did not know that appellant had driven himself there. During the first part of the interview, Holland repeatedly told appellant, "Tell me this was a mistake." Holland testified he told appellant this because "it's really not best to start calling it murder and say that they were the primary perpetrator or anything like that" if you want someone to "communicate what occurred with you legitimately." Also, there was a "belief at that time that [appellant] wasn't the primary perpetrator, that he could have simply been a witness." During the interview, Holland offered appellant refreshments and the chance to use the restroom.

Appellant eventually admitted to "making a mistake." Holland took a break in the interview and offered appellant more refreshments. When he restarted the interview, Holland confirmed with appellant that appellant knew he was not under arrest, he was still free to leave, and he was continuing the interview voluntarily.

In response to Holland's questioning, appellant stated he was living with Maloney in Dallas, and it could have been 2009. Maloney approached appellant and said a man "was throwing money and drugs at her" and they should rob him.

Appellant did not know Robinson.  Maloney met the man at the 777 club.  Maloney said the robbery was going to happen that night and that appellant should grab the man, "choke him out," and rob him.  Maloney planned to meet the man at the 777 club and text appellant.  Maloney texted appellant and said "we're on our way." Appellant was waiting in the garage of a house where Maloney was bringing the man.  Appellant was supposed to grab the man and bring him in the garage.  About ten minutes after appellant received the text, Maloney arrived with the man in the man's car.  Maloney walked faster than the man, and appellant grabbed the man and pulled him into the garage.  Appellant demonstrated how he grabbed the man by grabbing Mankin.

The man was trying to get away, so appellant grabbed a rope and wrapped it around the man's neck.  Holland showed appellant a picture of Robinson, and appellant identified Robinson as "the man he choked out."  Appellant choked the man for two to three minutes before the man stopped moving.  Appellant was standing behind the man, and the man lay down and stopped moving.  Appellant searched the man's car, and Maloney searched the man's pockets. Maloney took the man's wallet.  After being searched, the man still was not moving.  If the man regained consciousness, the game plan was to let him go.  Appellant put his finger under the man's nose to see if he was breathing and saw the man's chest was not moving.

Maloney told appellant to strip the man and put him in the trunk of the man's car. Maloney was "pretty cool." Appellant said it was not his intent to kill the man. Both Maloney and appellant took the man's clothes off, leaving him wearing only dark boxers, and both lifted the man's body into the trunk. Appellant stole the radio out of Robinson's car. Maloney said they were going to get cleaning supplies at WalMart. Appellant drove the man's car and parked it by the side of the road, and Maloney, now accompanied by Salaz, picked up appellant in his car. Appellant, Maloney, and Salaz went to WalMart and bought cleaning supplies and bleach. Appellant paid cash.

The three returned to the man's car, and appellant drove the car north on Highway 75 with Maloney and Salaz following. Appellant got off the highway at the Melissa exit and parked the man's car next to an abandoned storefront. Appellant opened the trunk, and appellant and Maloney poured bleach on the man's body while Salaz watched. Maloney closed the trunk, and appellant disconnected the battery because the lights would not go off. Maloney, appellant, and Salaz left and went back to the house. At the conclusion of the interview, appellant said he knew there was a recorder in front of him and that he knew he was not under arrest and was still free to leave. Appellant left on his own.

At appellant's subsequent trial, the recording of the interview was played for the jury. Mankin testified he and Holland returned to Texas where Mankin compared appellant's statement with the evidence that was collected in the case.

–7–

Mankin found that the cell phone records matched appellant's description of events. In particular, Mankin found Robinson received a phone call from Maloney the night of the murder around 11:45 p.m., and Maloney received a call from Robinson around 11:49. Mankin recovered a text message from Maloney to appellant at 12:53:42 on July 20 saying "About to come show him the house. You ready?" Mankin testified this text message "directly corroborates" what appellant said in the interview.

Dr. William Rohr testified he is the medical examiner for Collin County, and he performed the autopsy on Robinson's body. Rohr's finding of Robinson's cause of death was "undetermined homicidal violence." Rohr testified Robinson's body was badly decomposed, but "this apparently was some kind of an asphyxial-type death."

Appellant testified he had been living with Maloney for almost a year before she talked him into "participating in a robbery." Appellant testified he did not intend to kill Robinson. Appellant testified "the plan" was to take "drugs and money" from Robinson. The rope in the garage that appellant used to choke Robinson was just "something that [he] grabbed because he was trying to get away." Appellant testified he thought he could "choke [Robinson] out" like appellant had "seen on the wrestling matches all the time" and "knock somebody unconscious without killing him." Appellant testified he did not believe Robinson could have identified him. Appellant testified Robinson "didn't see [him] at all" and agreed "all [Maloney] would have to tell [Robinson] is y'all got jacked." Appellant testified he did not stand over

Robinson "with that cord choking him for two minutes" and let Robinson go when Robinson went to his knees.

When appellant came to the police station and saw the folder with pictures of appellant, Maloney, and Salaz, appellant realized this was about Robinson's murder, but appellant "didn't feel like [he] was able to" get up and leave. Appellant thought he could "be the State's witness" in the case and "not get charged" based on what the Ranger told him "repeatedly." At the conclusion of the evidence, the jury convicted appellant of capital murder. This appeal followed.

In his first issue, appellant argues the evidence is insufficient to support his capital murder conviction. A person commits the offense of capital murder if he commits murder in the course of committing or attempting to commit robbery. TEX. PENAL CODE ANN. § 19.03. The indictment in this case alleged appellant committed the following offense:

> [appellant] did then and there intentionally and knowingly cause the death of an individual, namely Richard Robinson, Sr., by a manner and means unknown to the Grand Jury and by choking of Richard Robinson, Sr., with defendant's hand and a cord and an object unknown to the Grand Jury, and the defendant was then and there in the course of committing or attempting to commit the offense of robbery of Richard Robinson, Sr.

We review a challenge to the sufficiency of the evidence on a criminal offense for which the State has the burden of proof under the single sufficiency standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Acosta v. State*, 429 S.W.3d 621, 624–25 (Tex. Crim. App. 2014). Under this standard, the relevant question is

whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2011). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Therefore, in analyzing legal sufficiency, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Id.* When the record supports conflicting inferences, we presume the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *Id.* Direct and circumstantial evidence are treated equally: circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Id.*

Appellant argues he lacked the intent to kill Robinson and, at most, acted only recklessly. By its nature, a culpable mental state must generally be inferred from the circumstances. *Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018). We cannot read an accused's mind, and absent a confession, we must infer his mental state from his "acts, words and conduct." *Id.* The culpable mental state for murder can be inferred from a defendant's motive, his attempts to conceal the body, and implausible explanations to the police. *Id.* The defendant's culpable mental state may also be inferred from the extent of the victim's injuries.

–10–

Here, apparently in an effort to show the "plan" was to let Robinson go free after the robbery, appellant testified Robinson did not see him and could not have identified him. Appellant agreed "all [Maloney] would have to tell [Robinson] is y'all got jacked," also presumably in an effort to show the non-lethal nature of the "plan." However, the jury was free to believe a more sinister interpretation of the fact that Robinson did not see appellant in the dark and could not have identified him. Namely, that when Robinson struggled and tried to get away, even though he would not have been able to identify appellant, appellant nevertheless used a cord to strangle Robinson until he was dead. Appellant also argues he did not use a gun or a knife, and this showed he did not intend to kill Robinson. The record shows that the rope appellant used to kill Robinson was sufficient.

After the murder, appellant and Maloney stripped Robinson and stuffed his body in the trunk of his car and then appellant stole Robinson's car stereo. Next, with Robinson in the trunk, appellant, Maloney, and Salaz went to WalMart to get bleach and cleaning supplies before parking Robinson's car at a vacant storefront, opened the trunk, and poured bleach on Robinson's body. Appellant also disconnected the battery on Robinson's car so the lights would go out. From the totality of the evidence, the jury could have concluded beyond a reasonable doubt that appellant intended to kill Robinson. *See id.* We conclude that, viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have

–11–

found the essential elements of capital murder beyond a reasonable doubt. *See Clayton*, 235 S.W.3d at 778. We overrule appellant's first issue.

In his second issue, appellant argues the trial court erred in denying his motion to suppress any oral statements he made to investigating officers. Appellant argues he was in custody when Holland and Mankin interviewed him, and he should have been given *Miranda* warnings. Further, appellant argues he was coerced into confessing, and his statements were not voluntary.

During a hearing on appellant's motion to suppress, appellant testified he was approached at the laundromat by a Louisiana State Trooper who called appellant by name and told appellant "they had some Texas Rangers that wanted to talk to [him] and [he] needed to talk to them." Appellant had been receiving mail from Texas regarding "warrants," and appellant "thought it was about a warrant." When appellant was directed to follow to the police station, appellant "felt like [he] had to go to the police station." Appellant drove to the police station and put his car keys under the floor mat because he thought he was going to be arrested, and he "was being detained." Appellant went inside the police station and waited "20, 25, maybe 30 minutes" before the Rangers came in the room and introduced themselves. One of the Rangers pulled out a folder and put it on the table. One Ranger told appellant they were "looking at [him] as a witness." When one Ranger opened the folder on the table and appellant saw his picture and pictures of Maloney and Salaz in the folder, appellant realized "he wasn't talking about traffic tickets anymore."

–12–

Appellant testified that, at that point in the interview, appellant asked if he could go check on his clothes "[b]ecause [he] didn't feel comfortable being there." The Ranger responded, "You have bigger things to worry about. Your clothes are going to be all right. Your clothes are good, or something like that." The Ranger left the interview room and, when he returned, he said "he talked to his buddy with the Louisiana State Police" and "he would be willing to pick up [appellant's] dry cleaning." Appellant "knew he was lying" because appellant had "no dry cleaning," but appellant did not say anything because he "didn't want them to get mad at me and retaliate."

Appellant testified Holland said he "knew exactly who [appellant was] with and what [he was] doing," but appellant "could be a witness" if he cooperated. Appellant "thought being a witness was being a witness and not a defendant." Holland said "all [appellant] needed to do was tell him that this was a mistake."

The Rangers did not tell appellant he could have a lawyer, but they did tell appellant he was free to go. However, appellant "didn't feel like [he] was free to leave" because he thought that, if he left, "some retaliation was going to be against either me or my family."

On cross-examination, appellant testified he was lying "all of the times that [he] answered that [he] knew [he] was not under arrest and that [he] knew [he was] free to leave." Appellant "felt like if [he] left it was going to be retaliation" because "[i]t was body language that [he] was reading." Appellant conceded that, at the end

–13–

of the two-hour interview, he was allowed to go back to his car so he could go to work.

Holland testified that, at the time of appellant's interview, Holland did not have a reason to arrest appellant, did not have an arrest warrant, and appellant "was primarily a witness at that time." Holland did not know "exactly what [appellant's] role was." Holland was not present when appellant was asked to come to the police department, and he "was told" appellant was "at a dry cleaners." Holland testified that, when appellant said he was worried about his clothes, appellant was "absolutely not" asking to leave. Holland agreed he was "somewhat surprised when [appellant] started talking about the fact that he was the person who actually killed Mr. Robinson." Holland testified he did not "make any promises of leniency or benefit to" appellant. Holland testified appellant did not do or say anything to indicate he wanted to leave, but Holland would have allowed appellant to leave. Holland testified he left the room and "talked to the LSP investigator about [appellant's] clothes" when appellant asked about his clothes.

Mankin testified he was not aware that appellant had any warrants when he had a conversation with appellant at the laundromat. Mankin testified he made it clear to appellant that, "if he wanted to come he could, but he did not have to." Mankin testified the Louisiana state trooper who made contact with appellant at the laundromat was aware that appellant "was not under arrest and that he was not being compelled to come to the police station." Mankin testified appellant did not ask to

leave at any point during the interview, and Mankin believed appellant was concerned about his clothes but "just minimally concerned." Mankin believed "Holland reassured him that they could try to make something happen with that." When appellant was "voicing his concerns about his clothes," Mankin did not "take that to mean that he wanted to leave and go to the laundromat to check on his clothes," but if appellant had wanted to leave, Mankin would have let him leave.

At the conclusion of the hearing, the trial court stated he would review the recording of the interview and make a ruling. The trial court subsequently denied appellant's motion to suppress and entered the following findings of fact and conclusions of law:

Findings of Fact

1. On Match [sic] 27, 2018, the Defendant, Mitchell Conrad Jones, was interviewed by the Texas Rangers as part of an investigation into the charged crime, murder, which was alleged to have occurred in Texas in 2009.

2. The officers contacted the Defendant in a public place and requested the Defendant to come to a local police station in Louisiana to answer some questions.

3. Defendant voluntarily drove himself to the police station in Louisiana.

4. The Defendant was offered coffee, tea and water and bathroom breaks during the interview.

5. The Defendant was told that he was free to leave at any time.

6. The Defendant was told repeatedly that the officers believed that he was a witness to a crime.

–15–

7. The arresting officer told the Defendant that he was not in trouble and that he seemed like a really good person.

8. The Defendant engaged in a lengthy conversation with the Texas Ranger investigating the case.

9. The Defendant voluntarily gave the officer a buccal swab to conduct a DNA comparison analysis.

10. The Defendant signed a statement stating that he voluntarily gave the DNA sample to the Texas Ranger.

11. The Defendant implicated himself in planning the robbery of the victim in this case by putting the victim "to sleep." The Defendant admitted he grabbed the victim and pulled him into the garage and choked him with a cord until he was not moving.

Conclusions of Law

1. The Defendant was not under arrest and was not in custody when he gave his statement.

2. The Defendant freely and voluntarily gave his statement to the law enforcement officer.

3. The Defendant was not coerced to give his statement and was not under duress.

4. The Defendant was free to leave at any time during the time he gave his statement.

5. The Defendant's rights under Art. 38.22 of the Texas Code of Criminal Procedure and the 5th Amendment to the U.S. Constitution were not violated by the law enforcement officer who obtained the statement.

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019). We give almost total deference to the trial court's determination of historical facts and review de novo the application of the law to the facts. *Id.* We view the record in the

light most favorable to the trial court's ruling and uphold the ruling if it is supported by the record and is correct under any theory of the law applicable to the case. *Id.*

Where the trial court has made express findings of fact, an appellate court views the evidence in the light most favorable to those findings and determines whether the evidence supports the fact findings. *See State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017); *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). An appellate court then proceeds to a de novo determination of the legal significance of the facts and will sustain the trial court's ruling if it is correct on any theory of law applicable to the case. *See Rodriguez*, 521 S.W.3d at 8; *Valtierra*, 310 S.W.3d at 447.

The statement of an accused may be used in evidence against him if it appears it "was freely and voluntarily made without compulsion or persuasion." TEX. CODE CRIM. PROC. ANN. art. 38.21. A statement may be deemed involuntary under several theories: (1) Article 38.22, section 6 (general voluntariness); (2) *Miranda* as expanded in article 38.22, sections 2 and 3 (the Texas confession statute); or (3) the Due Process Clause. *See Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008).

Appellant argues his oral statements were taken without the safeguards required by sections 2 and 3 of article 38.22 of the code of criminal procedure. Both sections 2 and 3 apply to statements made as a result of custodial interrogation. TEX. CODE CRIM. PROC. ANN. art. 38.22 §§ 2, 3. The trial court concluded appellant was

free to leave at any time, he was not under arrest, and he was not in custody when he gave his statement.

On the recording of the interview, appellant can be heard mumbling before he says "[unintelligible] check on my clothes see if they still there." Holland answers, "Oh, trust me, man your . . . your clothes are going to be good. We got more important things going on." Holland says he can have a state trooper get the clothes and asks appellant if he wants Holland to "ask him to do that." Appellant answers, "Yeah." Appellant did not, as he claimed at the suppression hearing, ask to leave. Instead, the record shows appellant said something unintelligible about a "check on [his] clothes," and Holland asked a Louisiana state trooper to check on the clothes, and appellant said "yeah" when asked if that was what he wanted. Appellant repeatedly confirmed throughout the interview that he knew he was free to leave and was not under arrest. We affirm the trial court's conclusion that appellant's interview did not amount to custodial interrogation. *See Rodriguez*, 521 S.W.3d at 8; *Valtierra*, 310 S.W.3d at 447.

Relying on *Oursbourn*, appellant argues that, "under the theory of Due Process, a confession is involuntary when there is police overreaching." *See Oursbourn*, 259 S.W.3d at 169. Appellant argues a confession is to be excluded on the ground of undue influence "if the influence applied was such to make the defendant believe his condition would be bettered by making a confession, true or false" but "if not, the confession is admissible," citing *Thompson v. State*, 19 Tex.

App. 593, 661 (1885). Appellant argues a promise that is so beneficial to the accused that it is likely to influence him to make a statement is a coercive promise which renders a suspect's resulting statement involuntary because it is not the product of his own free will, citing *Smith v. State*, 770 S.W.2d at 427.

Applying these authorities to this case, appellant argues his oral statements were involuntary because they were "induced by coercive police conduct and promises of leniency." Appellant cites Holland's repeated statements that appellant was a "witness" and his statement that he could "go back to the District Attorney and tell her that" appellant made "amends" for a "mistake." Notably, Holland followed this statement by saying, "I am not making any promise." Holland continued, saying that, if he told the DA appellant "made a mistake and" he cooperated, appellant's "life turns out pretty good," but if appellant decided he did not want to "say that this was a mistake," then Holland did not "think things go so good."

For a promise to render a confession invalid under article 38.21, the promise must have been positive, made or sanctioned by someone in authority, and of such an influential nature that it would cause a defendant to speak untruthfully. *Martinez v. State*, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004); *Coleman v. State*, 440 S.W.3d 218, 223–24 (Tex. App.—Houston [14th Dist.] 2013, no pet.). The truth or falsity of the statement is immaterial; the question is whether the promise likely would induce a false confession. *Martinez*, 127 S.W.3d at 794–95. General, unspecific

–19–

offers to help are not likely to induce one to make an untruthful statement and will not invalidate a confession. *Dykes v. State*, 657 S.W.2d 796, 797 (Tex. Crim. App. 1983); *Coleman*, 440 S.W.3d at 223–24. Similarly, general statements made to a suspect regarding how a confession can sometimes result in leniency do not render a confession involuntary. *Muniz v. State*, 851 S.W.2d 238, 253–54 (Tex. Crim. App. 1993). Any prediction about future events is not a promise. *Mason v. State*, 116 S.W.3d 248, 261 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (involving an officer's statements that the situation would "go better" for appellant by giving a confession was a prediction about a future event that did not amount to a promise).

The trial court concluded appellant was not coerced to give his statement and was not under duress. The record shows Holland specifically stated he was not making a promise. Appellant voluntarily drove himself to the police station and was told that he was free to leave at any time and that officers believed he was a witness to a crime. Holland testified that, at the time of appellant's interview, Holland did not have a reason to arrest appellant, did not have an arrest warrant, and appellant "was primarily a witness at that time." Holland did not know "exactly what [appellant's] role was." Thus, the record supports the conclusion that Holland was truthful in seeking appellant's statement as a witness and was not seeking appellant's confession to murder. To the extent Holland implied appellant might receive leniency from the DA for "making amends" or that "life turns out pretty good" if appellant cooperated, these statements did not amount to promises and did not render

–20–

appellant's confession involuntary. *See Muniz*, 851 S.W.2d at 253–54; *Mason*, 116 S.W.3d at 261.

Finally, appellant argues the "problem with appellant's confession is that the Texas Rangers extracted it by deliberately withholding *Miranda* warnings." Citing *Missouri v. Seibert*, 542 U.S. 600 (2004), appellant argues the officers in this case used a "two step technique" in which police "circumvent *Miranda* by obtaining a confession then warning the suspect and then getting the suspect to repeat the confession." In making this argument, appellant revisits the issue of whether appellant was "in custody." We have already determined the circumstances of the interview in this case did not amount to custodial interrogation. *Seibert* was a case involving custodial interrogation and is thus inapposite. *See Seibert*, 542 U.S. at 613–14. Under the facts and circumstances of this case, we conclude the trial court did not err in denying appellant's motion to suppress. *See Ruiz*, 577 S.W.3d at 545. We overrule appellant's second issue.

We affirm the trial court's judgment.

/Robert D. Burns, III/
ROBERT D. BURNS, III
CHIEF JUSTICE

Do Not Publish
Tex. R. App. P. 47.2(b)
190503F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

MITCHELL CONRAD JONES,
Appellant

No. 05-19-00503-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 366th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 366-81320-
2018.
Opinion delivered by Chief Justice
Burns. Justices Molberg and Carlyle
participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

Judgment entered October 5, 2020.